Loretta L Miller Pro Se

16340 Cagan Oaks
Suite 204
Clermont Florida 34714
LorettaMiller201@aol.com
532-988-5242

FILED

2018 MAR 20  PH 1: 06

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
401 West Central Boulevard
Orlando Florida 32801

LORETTA MILLER
Individual and Pro Se
Plaintiff

Case No   6:18-CV-00423-ORL-18-GJK

vs
Byran Blanchard, CRNP
Joseph DeSantola MD
Howard L Haber M.D.,
230 West Washington Sq 3rd fl
Philadelphia Pa 19107
Ralph Muller CEO &
Trustees of the
Pennsylvania Hospital aka
University of Pennsylvania
800 Spruce Street
Philadelphia Pa 19107
Charles R Bridges Jr M.D.
106 Pine Street,
Auburndale, MA 02466

Defendants

## COMPLAINT FOR DAMAGES

(Medical Malpractice, Corporate,
Negligence, Disabled Senior Abuse)

## FIRST CAUSE OF ACTION
Medical Malpractice

1

**COMES NOW,** Plaintiff and Pro Se Loretta L. Miller (Loretta Miller) individual complain of Defendants Dr Howard L Haber M.D. , Ralph Muller CEO & Trustees Of the Pennsylvania Hospital aka University of Pennsylvania ( U of PH), and Dr Charles R Bridges Jr M.D , Bryan Blanchard CRNP, Dr Joseph Desantola M.D. each of them and alleges as follows:

1.      The Defendants are true names Dr Howard L Haber M.D.; U of PH; Dr Charles R Bridges Jr M.D.; Bryan Blanchard CRNP; Dr Joseph Desantola M.D.. Plaintiff is informed and believes, and thereon allege on such information and belief, that each of the true named defendants are responsible in some manner for the occurrence herein alleged, either as physicians, surgeons, anesthetists, nurses, other medical practitioners, assistants, pharmacists, hospital attendants, or manufactures, suppliers, sellers or distributors or otherwise, and said defendants negligence acted or failed to act in one or more of said occupations businesses, which negligence proximately caused plaintiffs' injuries as herein alleged. The plaintiff is certain as to the manner or function of said defendants from hospital records, whether as physicians, surgeon, anesthetists, nurse, other medical practitioner, pharmacists, hospitals or hospital attendants,or manufactures, suppliers, sellers or distributors or otherwise, and the plaintiff pray to add each and every true name, capacities, functions, occupations and businesses of said defendants in the handling of the Cardiac Catheterization, the Open Heart Surgery, the treatment mentally and physically of the plaintiff, and the Temporary Epicardial Pacing recently found in the chest of the plaintiff and the alleged nursing after care.

2.      Plaintiff was informed and believes, and upon such information found in the plaintiff's hospital records and belief alleges that at the times and places mentioned herein defendants were the agents, servants and employees of the remaining defendants and each of them and each of them was at all times and places mentioned herein acting within the purpose and scope of said agency, service and employment. plaintiff further alleges that the defendants Howard L Haber M.D., Charles R Bridges Jr M.D., Joseph Desantola M.D., Bryan Blanchard CRNP, was the agents, servants or employee of the defendant U of PH.

3.      At said time and place, defendants U of PH, were and are now corporations, partnerships, associations, or other entities organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania as well as the Federal Laws of the United States and were at all times and places mentioned herein engaged in the ownership, operation, and maintenance of surgical centers, medical centers and/or hospitals, mental Institutions open to the general public and to paying patients in the County of Philadelphia in the Commonwealth of Pennsylvania of the United States.

4.      At all times mentioned, defendants Howard L Haber M.D., Joseph DeSantola M.D., and Charles R Bridges Jr M.D. and each of them, were and now are regularly licensed physicians, surgeons, radiologists, pathologists, Charles R Bridges Jr M.D. personal assistants he had in his "private" NIH - National Institute of Health which is part of the US Department of Health and Human Sources a Federally Funded Laboratory he had on/in the U of PH grounds who had access to his notes from

September 18th to 25th of 2007, certified physician assistants, engaged in the practice of Medicine and Laboratory experiments regarding to Charles R Bridges Jr, M.D. and the cardiac catheterization on September 18th 2007, that Howard L. Haber, M.D performed with offices and licensed in the county of Philadelphia Commonwealth of Pennsylvania in the United States of America. Bryan Blanchard CRNP was one of Charles R Bridges Jr M.D. nurses and assisted him during and after the surgery according to hospital records and was the one who *"discontinued"* the Temporary Epicardial Pacing wires from the body of the Plaintiff Loretta Miller.

5.      In 2007, the plaintiff consulted the defendant, Howard L Haber M.D. on the instance of Howard L. Haber M.D. a cardiac catheterization. The plaintiff did not want another Cardiac Catheterization. The plaintiff had no pain and felt fine but had a was slightly weak and tired from the Multiple Sclerosis. Howard L. Haber M.D. knew the plaintiff suffers with Multiple Sclerosis. The plaintiff had under gone a stress test given by Dr Joseph Desantola M.D.. Plaintiff was told it was not necessary for her to go under an Cardiac Catheterization but Howard L. Haber M.D. knew the plaintiff was coming in for the Jewish High Holidays to Philadelphia and told the plaintiff it would be an in and out procedure without any delays. Plaintiff Loretta Miller, was born June 12,1950 and was 57 years old at the time of the events with one successful open-heart surgery. The 1st open-heart surgery was done by Charles R Bridges Jr M.D.. The Plaintiff Loretta Miller had trusted Howard L. Haber M.D..

6.      On or about September 18, 2007 the plaintiff, Loretta Miller, underwent the Cardiac Catheterization performed by these defendants physicians at the defendant's facility Cardiac Catheterization Laboratory/Hospital. The defendant Howard L Haber M.D. did not consult the plaintiff but instead consulted the plaintiff's son Marcus F Miller who was waiting for the plaintiff. The plaintiff, Loretta Miller was wheeled out of the cardiac catheterization laboratory and into the hallway of the defendants facility and was reintroduced to Charles R Bridges Jr M.D. who was standing there with consent papers.

7.      At all times and places mentioned herein, the defendants Howard L Haber M.D. and Charles R Bridges Jr M.D. and each of them carelessly and negligently gave threatening instructions, miss-evaluation, examined, prescribed for, cared for and treated the plaintiff Loretta Miller for her medical conditions, including but not limited to her heart condition, and defendants and each of them provided hospital, medical, surgical, nursing, laboratory, radio-logical, care and services, manufacturing, and pharmaceutical services in a orchestrated untruth and negligent manner of which, among other things directly and proximately results in certain permanent injury and disability to said plaintiff, including but not limited to the physical damages of Temporary Epicardial Pacing Wires not removed on or about September 25, 2007 and found in a chest x-ray prior to an MRI and in a cat scan on or about May 2016 for an Multiple Sclerosis Brain MRI to determine if there are more lesions.

8.      As directed and proximate results of their acts of threats, lies, forcing the plaintiff to sign a consent form as a hostage, not allowing her to leave, telling the plaintiff Loretta Miller and her son Marcus F Miller in the hallways of the facility the

plaintiff was going to die without the surgery and refusing the plaintiff Loretta Miller a second opinion, denying her the rights under the bill of patients rights and to quote the defendants "You have good insurance (Medicare) we already got the temporary approval for a second open-heart surgery". Both defendants, Howard L Haber M.D. and Charles R Bridges Jr M.D., restrained plaintiff Loretta Miller, ordered the plaintiff's son to sign the consent form or the defendants, Howard L Haber M.D. and Charles R Bridges Jr M.D., were going to call Family Services to isolate the plaintiff from her son and place the plaintiff in a institution in Pennsylvania Hospital by Pennsylvania Mental Health Laws and Regulations for 72 hours so they could get a court order to force plaintiff Loretta Miller to under go a second open-heart surgery. and have the plaintiff's son arrested. *Darling v. Charleston Community Memorial Hospital (1965), 33 Ill.2d 326, 211 N.E.2d 253.* Plaintiff signed the consent form and next to her signature she wrote she signed this: "under duress". The form that was presented in her records were not the form she originally signed. (Exhibit B passport signature) What is in the record is not her signature, her printing or her dating. Loretta Miller always puts a cross in her seven (European Seven). **PA Title 18 § 2902.**

9.      According to the records of admission of U of PH there are Four (4) different signatures all claiming to be Loretta Millers scribe. None of them match. (Exhibit C)

10.      According to the records of admission of U of PH they state no record of an Advance Directive was presented to them. In Exhibit D is the form stating no Advance Directive and in Exhibit E is the Advance Directive which they refused to make a copy of. If they were untruthful in one paper the U of PH was untruthful in all.

11.      According to the records of admission, Loretta Miller refused to sign the check if discussed for the sections of General Anesthesia, the Central Venous (CVP) or the Pulmonary Artery (Swan-Ganz) Catheters or the Arterial Catheter (A-Line). This form was not discussed or signed by Loretta Miller but her signature was forged on this paper. As well as not dated. (Exhibit F)

12.      The only true initials are on the Jewelry Removal Consent and Waver at Pennsylvania Hospital dated September 18, 2007 6:38 am for the Cardiac Catheterization but the date and the time were not written by Loretta Miller. (Exhibit G)

13.      According to the admission stamp on top of the hospital consent form the name of Dr Joseph Desantola M.D. appears. Dr Joseph Desantola M.D. only saw Loretta Miller for the stress test and nothing else two to three (2 to 3) months prior to the test. Howard L Haber M.D. claims he was the admitting doctor and he along with Charles R Bridges Jr M.D. made the decision for the surgery on Loretta Miller. According to Dr Joseph Desantola M.D.'s record from the stress test he stated that Loretta Miller should not have the Cardiac Catheterization and he did not recommend it, (Exhibit A June 7, 2007 and July 19, 2007) This was also stated on the Operative Summary report dictated by Dr Charles R Bridges M.D.. Either Dr Joseph Desantola M.D. was part of the Medicare scam of fraud or his name was placed on the record as a cover up or to blackmail Dr Joseph Desantola M.D. into not objecting to Dr Howard L Haber M.D.

4

and Dr Charles R. Bridges Jr M.D. Fraud.

14.     Loretta Millers EKG was near normal with the PR = .16 the ORS = .10 and the QT = .30 See chart and Pre-Cath Assessment. (Exhibit H)

15.     According to the Discharge Summary (Exhibit I) dated September 25, 2007 signed by Bryan Blanchard: *"Once the patient was in the Coronary Care Unit, the patient's medical management was optimized"*, however according to the CCU Loretta Miller went into Ventilation failure over 6 hours. *"She was weaned from the ventilator and extubated . She was aggressively diuresed."* Loretta Miller was going into congestive heart failure from the surgery she just had not because she was in congestive heart failure before, the diuresed is the past tense of diurses -an increased excretion of urine. For over 6 hours or more Loretta Miller went into congestive heart failure that was drug related from the surgery and was dying. The Discharge Summary continues: *"Once criteria was met for chest tubes to be discontinued."* According to this statement, the chest tubes were disconnected (removed) from the mid section of Loretta Miller's body. Bryan Blanched used the term disconnect to indicated he removed the Temporary Epicardial Wires not cut, not clipped, not severed but removed them. There are no tubes existing in Loretta Miller's mid-chest. *"They were discontinued without any adverse sequels."* The event of congestive heart failure stopped suddenly *"She was eventually transferred to the sixth floor telemetry, she received aggressive physical therapy. She did well with the physical therapy."* Loretta Miller's physically therapy was how to use a walker and relearn to use the steps since her gait was bad from the remission of Multiple Sclerosis due to the stress she had mentally and physically gone through. Loretta Miller did well because she pushed herself to get out of the U of PH in fear they were going to find another bogus problem with her. *"Her epicardial pacing wires were discontinued without any adverse sequelae and on 9/25/2007, Ms Miller was stable and ready for discharge home."* Epicardial pacing wires were discontinued where it is assumed he meant removed. He did not say he cut them, severed them, and let them curl into her body without adverse sequelae but basically said they were no longer there.

16.     On the Discharge Summary the name of the attending Cardiothoracic surgeon is Dr Charles R Bridges M.D., the attending cardiologist is Dr Howard L Haber M.D.. The carbon copies were sent to Dr Charles R Bridges M.D., Dr Howard Haber, M.D., and Dr Joseph Desantola M.D..

17.     Loretta Miller was discharged with the following medications: Aspirin 81 mg, Cartia XT 360mg po daily, Lasix 40 mg po daily, Crestor 10 mg po daily, Zyrtec 10mg po daily, Lantus Solo Star pen 40 units qhs, Colace 100mg bid p r n for constipation, and Percocet for pain. Please note there were no blood thinners prescribed to Loretta Miller. If Loretta Miller had a new clot they would have administrated medications like Plavix. But, Loretta Miller had the same clot that was caused from a knee surgery which she had in 1998 at the Rothman Institute of Thomas Jefferson Hospital. Loretta Miller's clot was bypassed in December 10, 2001.

18.     According to the Operative Report (Exhibit J) dated 09/19/2007 signed by Dr

Charles R Bridges M.D., the surgeon states Dr Charles R Bridges M.D. was not in the surgical suite at closing but someone had to close Loretta Miller and someone had to place the Temporary Epicardial pacing wires. From Modern Medicine:

http://www.modernmedicine.com/modern-medicine/content/epicardial-wires *Temporary pacemaker leads are routinely placed on the epicardium—the outer layer of heart muscle—during cardiac surgery. The wires extending from the leads provide quick access to a temporary pacemaker's pulse generator in case something goes wrong in the early postop period. ----That's critical when you consider that dysrhythmias are common after heart surgery and can occur for any number of reasons, including electrolyte imbalances, hypothermia, and injury or edema from the procedure itself. ----- Typically, the surgeon places four wires, attaching one positive and one negative electrode to both the right atrium and the right ventricle before the chest is closed. The physician loosely sutures the leads onto the epicardium and threads the wires through to the outside of the chest via small, stab-like incisions. -----The wires attached to the atrium exit the chest on the right side of the sternum; those attached to the ventricle exit the chest on the left. That way, either the atrium or ventricle or both may be paced as needed. And while the wires attach to the same pulse generator as transvenous pacemakers, there's one crucial difference: The epicardial pacing wires are usually not attached to the pulse generator unless pacemaker therapy is indicated. -----In caring for a patient with these pacing wires—which remain in place anywhere from 24 hours to several days postop—you'll need to ensure that the wires are properly managed and ready for action. You'll also need to monitor the exit sites for signs of infection. -----While epicardial pacing wires are meant to provide a safeguard against dysrhythmias, they have the potential to cause a lethal rhythm. Because the unattached wires provide a direct route for electrical current to flow to the heart, any stray current poses a threat to the patient. Microshocks— low-voltage electrical current from ungrounded equipment or static electricity—can pass right through you and into your patient. As little as 0.1 mA can cause ventricular fibrillation. ------Preventing microshocks is your No. 1 priority in managing epicardial pacing wires. To avoid them, you should always wear gloves when handling the wires. It's also necessary to keep the wires insulated by covering each one with a finger cot or the snipped-off finger of a disposable glove. ------To avoid stray electrical current, allow only battery-operated devices, such as a radio or shaver, at the patient's bedside. In addition, check to see that any electrical equipment in use is grounded. Remove any device that doesn't have a grounding pin on the plug. If the patient's bed doesn't have a grounding pin or the grounding pin is broken, unplug the bed and leave it unplugged until the pacing wires are removed.nn* Loretta Miller still has her Temporary Epicardial Wires in her chest. They were never taken out. There is so much scar tissue or adhesions from the wires shocking, burning, cooking her that they can not be removed unless a 3rd open-heart surgery is performed. All the cardiologists the plaintiff had seen and spoken to in Florida refused to remove the wires since it is an elective surgery like the extra veins which Dr Howard L Haber M.D. wanted and was not needed. The Plaintiff feels that Dr Charles L Bridges M.D. did not do the surgery but allowed a inexperienced person to perform a medical surgery on the Plaintiff since he claimed he was there for the graphs and left. The Plaintiff feels her surgery was a classroom exhibit since the U of PH is a teaching institution and Dr Charles R Bridges M.D. was a professor there in Cardiovascular surgery. The Plaintiff can not have an MRI for any diagnostic evaluation especially for her Multiple Sclerosis or any other needed MRI. An MRI can rip these wires right out of the Plaintiff's chest and cause the Plaintiff to die right on the MRI table. Defendant Dr Charles R Bridges Jr M.D. who was not in the surgery room allowed someone or appointed someone who was not experienced to suture theses wires tightly or wrong

(since on some wires have a loop in the center) to the Epicardium. The tightness or the wrongly sutured wires did not permit the wires to be removed smoothly with a smooth short gentle tug. Bryan Blanchard CRNP was untruthful in his Discharge Summary. He stated he discontinued the Temporary Epicardial Wires like he discontinued the Chest Tubes. The Chest Tubes were removed but the wires were cut and permitted to retract into the chest cavity where it began causing major problems. Bryan Blanchard, CRNP, was either covering up for the person who had actually sewn in the Temporary Epicardial Wires and/or is covering up for Dr Charles R Bridges M.D., who abandoned the Plaintiff on the surgery table, allowed someone in the surgical suite to go ahead and close her not knowing what they were doing, or allegedly he was the one who placed the Temporary Epicardial Wires, or he just didn't care. Dr Charles R Bridges M.D. does not even mention in his Operative Report that the Temporary Epicardial Wires were used or sewn in. But in the 2001 Operative Report (Exhibit K), he mentions the Temporary Epicardial Wires but had a different assistant Patrick J Murt Pa-C who removed the wires.

19.     Loretta Miller's husband, Jordan Miller, was a Veterinarian and performed open-heart surgery and grafts at his animal hospital and plaintiff, Loretta Miller, who was a trained human Medical/X-ray Technologist and a Medic in the IDF assist him and removed many Temporary Epicardial Wires from pets who underwent open-heart surgery. She also attended many classes at Human Medical and Veterinary conventions dealing with all forms of surgery. When her husband, Jordan Miller, had a cardiac arrest she saved his life with an epidural needle to his heart to restart his heart and did CPR on him with a Hudson Manual Resuscitation Bag for air after she cleared his airway.

20.     Bryan Blanchard, CRNP, stated the Allen Test was sluggish. Bryan Blanchard, CRNP, did not take in consideration Loretta Miller suffered from Raynaud Syndrome. Raynaud syndrome, also known as Raynaud's Phenomenon, is a medical condition in which the spasm of arteries cause episodes of reduced blood flow. The color not returning to Loretta Miller's fingers and hands are part of Raynaud Syndrome. This was one of the major reasons Loretta Miller and her husband, Jordan Miller, moved to Florida. The episodes result in the affected part turning white and then blue. Often, there is numbness or pain. As blood flow returns, the area turns red and burns. The episodes typically last minutes, but can last up to several hours. Episodes are often triggered by the cold or emotional stress. Loretta Miller was under emotional stress by the treatment the Defendants forcing Loretta Miller to undergo surgery that could kill her and they refused her to leave to get a second opinion. There are two (2) main types Raynaud's Syndrome: (1) primary Raynaud's, when the cause is unknown and (2) secondary Raynaud's which occurs as a result of another condition. Secondary Raynaud's can occur due to a connective tissue disorder such as scleroderma or lupus, injuries to the hands, smoking, thyroid problems, and certain medications, such as birth control pills. Diagnosis is typically based on the symptoms. The primary treatment is avoiding the cold. Loretta Miller did not have Lupus, she does not take birth control pills, she does not smoke, and she had no injuries to her hands but, she has Hashimoto (a thyroid problem) and Raynaud's Syndrome is common with people who have Multiple Sclerosis. Plaintiff Loretta Miller was diagnosed with Raynaud's Syndrome in 1971 in Israel while she was in the Israel Defense Force and again in

7

Philadelphia in 1980.

21.     Bryan Blanchard, CRNP, without any regard to Plaintiff Loretta Miller's
feelings called the plaintiff obese to her face and on her record without knowing the
reason why Loretta Miller gained weight which was from her Hashimoto's thyroid
problem. Hashimoto's thyroid problem raises the sugar level and causes weight gain.
Loretta Miller's Hashimoto thyroid problem was discovered in 2008 with a ultra sound
to her neck.

22.     With respect to U of PH, Dr Howard L Haber M.D., Dr Charles R Bridges Jr
M.D., and Dr Joseph Desantola M.D., the Plaintiff also alleges that the Defendants
were recipients of federal funds and contracted with the United States Department of
Health and Human Services ("DHHS") to provide medical services to Medicare
patients.

23.     According to Pennsylvania Hospital Coding Summary Diagnosis Related
Group  *"548 CORONARY BYPASS W CARDIAC CATH  expected reimb $29,240.00"*
under diagnosis  on line 18   states pulmonary congestion (congestive heart failure)
and hypostasis (the accumulation of fluid or blood in the lower parts of the body or
organs under the influence of gravity, as occurs in cases of poor circulation or after
death) (Exhibit L) 1. there was no indication in the X-rays taken that Loretta Miller
ever had congestive heart failure. (Exhibit M) September 19. 2007  9: 37 am pre-
operative evaluation two (2) X-ray Chest Views  page 89 states: *"The lungs are clear
there is not consolidation, effusion, or pneumothorax. The heart and medastinum are
normal in appearance and there is no pulmonary vascular congestion. Median
sternotomy wires and mediastinal clips are noted. There are mild degenerative
changes of the thoracic spine"* signed by Beth Scott attending resident.   Dr. Beth
Scott, D.O. is a board certified radiologist in Philadelphia, Pennsylvania. She is
currently licensed to practice medicine in Pennsylvania and New Jersey. She is
affiliated with Pennsylvania Hospital, Hospital of the University of Pennsylvania, and
Temple University Hospital; 2. Page 87 states *"No evidence of significant
atherosclerotic plague or internal carotid artery stenosis. Normal vertebral artery
flow signed by Michael Love attending resident."*   Dr. Michael Love, M.D. is a board
certified radiologist in Philadelphia, Pennsylvania. He is currently licensed to practice
medicine in Pennsylvania, New Jersey, and Alabama. He is affiliated with
Pennsylvania Hospital, Hospital of the University of Pennsylvania, and Einstein
Medical Center Philadelphia.; 3. Page 90 September 20, 2007, 9:24 am Status post
surgery, Chest 1 view *Left basilar opacity likely represents a combination of
atelectasis and effusion signed by  J Bruce Kneeland attending resident.* Professor of
Radiology at the Hospital of the University of Pennsylvania A Pleural Effusion is
often associated with atelectasis (collapse of lung tissue) Atelectasis is an abnormal
condition characterized by the collapse of lung tissue, preventing the respiratory
exchange of carbon dioxide and oxygen. Atelectasis – a collapsed or airless state of the
lung – may be acute or chronic, and may involve all or part of the lung. The primary
cause of atelectasis is obstruction of the bronchus serving the affected area. After heart
surgery, the combination of a pleural effusion and atelectasis sometimes results into
what is called a Dressler's Syndrome or Post-Cardiotomy Syndrome and occasionally

happens after heart surgery. MRI scan may show an effusion and, more recently, has been shown to reveal pericardial involvement. Loretta Miller can not take an MRI because of the Temporary Epicardial wires which were left in her chest to check on pericardial involvement; 4. However there is an indication that Loretta Miller went into Ventilatory Failure – Drug Related included in Exhibit L.

24.    Plaintiff alleges that: 1. Defendant Howard L Haber M.D., Charles R Bridges Jr M.D., U of PH, deprived Loretta Miller of her due process in violation of **42 U.S.C. § 1983**; 2. the Defendants Howard L Haber M.D., Charles R Bridges Jr M.D., U of PH violated Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("RA"); 3. U of PH failed to stabilize an emergency medical condition before transferring her to outside surgical suite on an "Emergency Surgery" with the absence of the surgeon where she went into Ventilation Failure in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"); (4) Howard L Haber M.D., Charles R Bridges Jr M.D., U of PH are liable for professional negligence, under state law. The Plaintiff expressly seeks damages against all four defendants, in excess of $75,000; punitive damages against Howard L Haber M.D., Charles R Bridges Jr M.D., U of PH : injunctive relief against Howard L Haber M.D., Charles R Bridges Jr M.D., and U of PH requiring it to modify its practices to accommodate patients with disabilities.

25.    This similar action was file against Milton S. Hershey Medical Center ("HMC"), a hospital which is "an an affiliated with the University of Pennsylvania"in case *LANGSTON V. MILTON S. HERSHEY MED. CTR. CIVIL NO. 1:15-CV-02027.* It seems this is their motus operandi and operatio signa with people who are disabled share the same experience.

26.    As a direct and proximate results of these acts, omission and conduct of the defendants and each of them, in terrorizing the plaintiff Loretta Miller by Dr Howard L Haber M.D. and Dr Charles R Bridges Jr M.D., the plaintiff signed the consent forms under duress and stated so on the consent form. The signature on the existing consent form found in the record is not Loretta Miller's signature. The plaintiff was brought into a closet like room where there were no phones and placed in hospital restraints not because they feared the plaintiff would harm herself but feared she would get dressed and leave. The clothes of the plaintiff were not returned until after the surgery. The plaintiff was given food that she could not eat since she is Kosher. The plaintiff, Loretta Miller, was given Dextrose IV which is an intravenous sugar solution and was told that she is being treated for diabetes when she had Hashimoto's Disease and any stress causes thyroid hormones to lower the pancreatic insulin and raise the sugar levels to abnormal levels. **PA Title 18 § 2902. (a)(1).**

27.    According to the nurse's report, the plaintiff took a shower to cleanse herself for a surgery she did not want. If the plaintiff was so sick after the cardiac catheterization and with the site of injection on her inner thigh she would have been too weak to take a shower. But Loretta Miller was bed ridden because of the Cardiac Catheterization and in restraints so she would not leave the hospital. She was sedated after she signed a consent form unwillingly to with the statement signed under duress

and she did not see an admission clerk, when she entered the room without a phone and without a window and no bathroom. The hospital had the wrong contact information and wrong phone number and it reflects on the record. The record only showed the land line telephone number in Wellington Florida of Loretta Miller not a cell phone number of Marcus F Miller. The only bathroom was in the hallway and a bed pan was used on Loretta Miller since she remained in restrains tied down to a bed with the rails up sedated.

28.     As a direct and proximate result of the acts, omission, and conduct of defendants including and not limited to failure of defendants Dr Charles R Bridges Jr M.D. to remain in the operating room until plaintiff Loretta Miller's Temporary Epicardial Pacing Wires were properly sutured in and properly closed; failure of the defendant Dr Charles R Bridges Jr M.D. to designate another qualified physician and note in his report the name who sewed the Temporary Epicardial Pacing Wires in and who closed the plaintiff chest, failure to care for the plaintiff prior to leaving the operating room while plaintiff Loretta Miller was in unstable condition, and the defendant failure to timely and appropriate respond to plaintiff, Loretta Miller's, deteriorating condition. The Plaintiff Loretta Miller suffered respiratory failure caused from drug reaction from the surgery and the care after the surgery; circulatory failure; neurological failure and seizures in the ICU where restraints were used, and because he was too busy to stay in the surgical suite.

29.     As a further direct and proximate result of the acts, omissions and conduct of the defendants and each one of them and said injuries caused to the plaintiff Loretta Miller, the plaintiff went to see Dr Howard L Haber M.D. for a post surgical visit. The plaintiff did not feel well after the surgery and Dr Howard L Haber M.D. said he can not do another Cardiac Catheterization for another six months according to the plaintiff's insurance (Medicare) and that the defendant did all he could. Then defendant Dr Howard L Haber M.D. said he guaranteed no more open-heart surgeries and the plaintiff should just bare with the feeling for another six months. The plaintiff asked Dr Howard L Haber M.D. to show and explain why she needed this second open-heart surgery and explain how she was in danger of losing her life if she did not undergo this surgery. The defendant responded that it was not an emergency and he wanted more veins since the first surgery did not accommodate him. Defendant, Dr Howard L Haber M.D., also stated that if he did not threaten the plaintiff, the plaintiff Loretta Miller would not undergo a surgery willingly that she did not need.

30.     The Plaintiff's left forearm veins were harvested which caused nerve damage. The Plaintiff's use of the hand is now limited. This scar has caused the plaintiff emotional trauma and embarrassment in public so much that in 90 plus degree weather the plaintiff wears long sleeves to cover the scar because makeup cannot cover the scar. There is a constant pain coming from this scar area which never happened before the surgery. The Plaintiff can not function normally by doing normal routines in daily living since the surgery due to constant muscle spasms in the thumb and phalanges 2 and 3 in the hand which contorts the entire left hand.

31.     The Plaintiff's right had was damaged from the hole found after the surgery.

The hole was bleeding, painful and swollen. The defendant's did their best to avoid, ignore, and not treat the hole since the defendant's floor nursing staff were too busy holding conversations in the hallways talking about Halloween costumes and decorations. The defendant nursing staff told plaintiff's son, Marcus F Miller that they needed to contact her attending physician and that plaintiff was not in "mortal danger", even though the plaintiff's son Marcus F Miller asked if plaintiff Loretta Miller had diabetes as they claimed and the infection is not cared for which is a nursing issue then the Plaintiff could lose her hand. That was when treatment started on the right hand. The Defendant's during surgery placed a known lead in her right hand for an unknown use. When it was taken out, the Defendant Dr Charles R Bridges Jr M.D. did not treat, look at, or care for the damaged, swelling and bleeding hand as well as the ulna nerve which they damaged and the hands and fingers when relaxed retract to an unnatural positions, phalanges 4 and 5 are retracted inward and constant muscle spasms are experienced.

32.     The plaintiff, on or about September 2008, made an appointment at the Cleveland Clinic in Westin, Florida. There, the plaintiff complained about her feelings to the new Cardiologist, Dr Bush. The plaintiff was sent in for a cardiac catheterization and they found a twisted main vein from the first graft. The plaintiff had the DVD from the cardiac catheterization from Dr Howard L Haber M.D.'s cardiac catheterization on or about September 18, 2007. Dr Bush who did the cardiac catheterization at the Cleveland Clinic in Westin Florida said look what they put her through she did not need another open-heart surgery. Then he put a double stent into the twisted vein. The Plaintiff was placed on Plavix for six (6) months. The plaintiff has not had a problem since. The plaintiff was slowly weaned off of all medications that pertained to the heart after six (6) months on a blood thinner for the stent. Then placed on aspirin only. (Exhibit M)

33.     The Plaintiff switched neurologists since she moved to Lake/Polk county in Florida. She made an appointment with the Watson Clinic for treatment of her Multiple Sclerosis. The procedure at the Watson Clinic is for every patient who gets an MRI there is a pre screening chest x-ray. The pre screen x-ray demonstrated four (4) Temporary Epicardial Pacing Wires in the plaintiff's chest. These wires are or maybe floating, maybe attached to the heart, may have caused burning from Micro waves and cell phones, or all of the above. This is called an Electrical Storm caused by Pacing on Epicardial Scars. The radiologists feel they are surrounded by scar tissues. Treatment of the plaintiff for the Multiple Sclerosis was halted due to finding a cardiologist who would be able to remove them since they cause a burning sensation in the chest near a transmission of electromagnetic fields and appliances. (Exhibit N)

34.     The Plaintiff went to the Cardiology Department of the Watson Clinic; had an entire work up which included an NM Myocardial Perfusion Regadenoson Spect Multiple Rest and OR Stress by Dr Sean O'Rourke M.D. on June 20, 2016 at the Watson Clinic; a cardiac catheterization by Dr Joseph Massasoit M.D. on July 18, 2016 in Lakeland Hospital; and visited a Cardiothoracic surgeon, Dr Andres Medina M.D. at the Watson Clinic. Dr Andres Medina M.D. told the plaintiff, Loretta Miller, that it was too dangerous to remove the Temporary Epicardial Wires and that this

11

should have been removed surgically days after the surgery if the surgeon himself could not remove it normally post surgical through arthroscopic surgery by doctors who places pacemakers in the body under a surgical fluoroscope. He also stated that the defendant Dr Charles R Bridges Jr M.D. may have allowed an inexperienced John or Jane Does to attach the Temporary Epicardial Pacing wires or waited too long to remove them just cut them because the insurance time for this surgery was running out. Dr Andres Medina M.D. pointed out the scar area from the surgery of 2007 is still inflamed and needs the attention of a plastic surgeon to graft the area and relieve the itching caused by the burns from the Temporary Epicardial Pacing Wires inside. But before all this can be done, the wires need to be removed and it is too dangerous to go into the chest on a third open-heart surgery to fish for and remove the wires that are moving. When Dr Andes Medina M.D. read the Operative Report of 2007 he was appalled that defendant Dr Charles R Bridges Jr M.D. abandoned the plaintiff Loretta Miller on the table in the surgical suite and those in the surgical suite could call the defendant, Dr Charles R Bridges Jr M.D., if something went wrong which the unknown surgical team did not do. It was the defendant's, Dr Charles R Bridges Jr M.D., responsibility to finish the surgery, take care of the seizures of the plaintiff, Loretta Miller, by calling in a Neurologist from the drug related neurologic failure that caused more damage to the brain from lack of oxygen from drug related Ventilatory failure which caused circulatory failure and respiratory failure; the plaintiff, Loretta Miller, has Multiple Sclerosis. (Exhibit N)

35.     The Plaintiff had to relearn how to walk, how to swallow food and drinks, how to move bowels and control her urine, how to hold items on the left side, and how to speak without a slur. She needed to relearn how to use her right hand which was damaged, still damaged and has a contusion and inflammation of the Ulna Nerve leading up to her neck.

36.     At all times during the hostile hostage hospitalization of the plaintiff, the plaintiff, Loretta Miller, complained to the defendants and that her hand was swollen, bleeding and infected. The defendants refused to clean the hole found in the plaintiff's hand; give her ice for the swelling; refused to explain the hole in the hand but stood in the hallways outside the plaintiff room making fun of the plaintiff.

37.     Plaintiff learned of the defendants' negligence and the true cause of the plaintiff, Loretta Miller's, catastrophic injuries upon viewing a x-ray at the Watson Clinic on or about May 29, 2016 from an unascertained medical care providers of plaintiff Loretta Miller. The x-ray technologist showed plaintiff Loretta Miller that there were Temporary Epicardial Pacing wires in the chest x-rays and they can not do the MRI scheduled for the plaintiff that day.

38.     Plaintiff learned again of the defendants' negligence on or about the July 1st 2016 in a hospital Operative Report dictated by the defendant Dr Charles R Bridges Jr M.D. in the hospital records and a copy of the said Operative Report in the records of defendant Dr Howard L Haber M.D. that defendant Dr Charles R. Bridges Jr M.D. had walked out in the middle of Loretta Miller surgery and left a unknown Jane and/or John Does to finish performing the surgery. The records show that the defendant action

in the care and treatment had caused the plaintiff, Loretta Miller's, injuries.

39.     Dr Howard L Haber M.D. lied on a letter to the plaintiff's former primary
doctor Dr Bryan Margerum M.D. on December 5, 2003. Here he stated that Loretta
Miller was depressed and going to commit suicide when he did not listen to the real
story. After Jordan her husband passed away Loretta Miller called the Jewish
Community Center (JCC) for Grievance Counseling. Loretta Miller was told they
needed to see if her Health insurance covered them. One month later Loretta Miller got
a call back telling her the insurance did not cover them and said she would have to pay
out of pocket for the counseling. Loretta Miller asked three (3) times how much will it
cost. The first answer was *what are you willing to pay?* Second answer was *how
much money do you have?* and the last answer was *How much was your husbands
death worth to you?* At that point Loretta called them cruel and hung up. The Friday
before the JCC called Loretta Miller fell in Pet smart where she slipped on dog urine
and went to the ER where she received pain killer samples which she never took and
left it on the kitchen counter with her heart medications. Loretta Miller's son went to a
friends home on Saturday across the street , who had a party and he brought his own
tequila. When he came home he left the bottle on the kitchen counter that was still
sealed. Loretta Miller does not drink. The JCC called Loretta Miller's house 4 times
after she hung up on them. Loretta Miller took her dog for a walk and when she came
back she found a policewomen standing outside her home saying we have to take you
away. Loretta Miller was confused with what was happening and said she needed to
take the dog inside call her son and tell him what is happening and to call an attorney.
When Loretta Miller walked to the door and opened it the Policewomen punched her
in the chest, through her in the house and Loretta Miller turned blue. She
screamed *you have drugs and booze on the counter.* To quote the policewomen who
was fired after an internal affairs investigation said as she watched Loretta Miller
turn blue "*Oh Shit No one told me she had a CABG. She hit Loretta Miller again and
said I'm going to get my $7000 for Baker Acting you one way or another and if you
say a word I'll make sure you die before you get to the ER.*" Loretta Miller was taken to
the ER by EMTs treating her for a heart attack and was admitted for chest pains and
assaulted through police  brutality. The cardiologist who was taking care of Loretta
Miller wanted to move her to another hospital in another town but the Florida State
Psychiatrist was coming in to interview Loretta Miller. If Loretta Miller left the
hospital to go to another one in another town the count of days for seeing the
psychiatrist would be extended and Loretta Miller would have no say in her treatment.
The Psychiatrist spoke to Loretta Miller for one (1) hour, heard her story and rescinded
the charges and accusation of Baker Acting and gave her four (4) names of attorneys to
sue Royal Palm Beach police department and the JCC. Which she did and settled out
of court. Loretta Miller said was going to see her cardiologist ( Dr Howard L Haber
M.D.) who she thought she could trust and her Primary (Dr Bryan Margerum M.D.)
who Loretta Miller trusted on December 5th, 2003  she an appointment to see both
doctors on the same day. The policewomen was not paid by the State of Florida the
bonus of $7000.00 for Baker Acting. Loretta Miller made it her business to met with
her Florida State Congresswoman Shelly Vanna  to change the laws on payment for
Baker Acting. Together they both wrote an amendment to the law to stopped fake

Baker Acting by eliminating the incentive of $7000.00 a person/patient. The impression Dr Howard L Haber M.D. gave her former Primary Physician was Loretta Miller attempted to commit suicide. Loretta Miller told Dr Bryan Margerum M.D. herself that day of the incident and had him document the bruises on the record that were still black and blue. If Loretta Miller was so unstable with her emotions and mental issues why would Dr Howard L Haber M.D. want her to sign an consent form and not have her Health Care Directive sign the consent form? This letter was found when Loretta Miller requested her records from Dr Howard L Haber MD office. June 2016. According to HIPAA: Information in medical records is considered highly private and sensitive. Medical ethics rules, state laws, and the federal law known as, the Health Insurance Portability and Accountability Act (HIPAA), generally require doctors and their staff to keep a patient's medical records confidential, unless the patient allows the doctor's office to disclose them. Loretta Miller did not give Dr Howard L Haber M.D. Permission to disclose this information to anyone because it was a law suit being developed. This was also a violation of Doctor/Patient Confidentiality and that his letter is speculation and untruthful. Loretta Miller made it very clear during her visit to Dr Howard L Haber M.D. unless he was contacted by her Attorney he was disclose or discuss the incident with anyone but treat if needed. Dr Howard L Haber MD violated the Patient and Physician confidentiality when he wrote to Dr Bryan Margerum MD and said *"As you know since she went to Florida, her husband Jay died from heart failure, and she had severe depression episode, which she ended up with being committed to a hospital for suicidal ideation."* Loretta Miller was being set up at that time and period for a 2nd cardiac catheterization which would have lead to the 2nd open-heart surgery because she was a widow. (Exhibit O)

40.     Dr Howard L. Haber M.D. also stated numerous times in his letters to Dr Bryan Margerum M.D. that the Plaintiff Loretta Miller was on Zoloft for depression when she was taking Zoloft for Fibro Myalgia. (Exhibit P)

41.     From 2003 to 2007 Dr Howard L Haber MD did his best to get Loretta Miller in for another Cardiac Catheterization but Loretta would not make the appointment. Loretta Miller took a stress test and it was clear other then the old embolism from an knee surgery. Also the IgG was not followed through. The late Dr Michael J Haut M.D. indicated Loretta Miller may have another autoimmune disease called Anticardiolpin Syndrome which requires low doses of blood thinners. Dr Michael J Haut M.D. also diagnosed Loretta Miller with Raynauds Syndrome. Dr Howard L Haber M.D. never treated Loretta Miller for blood clotting disorders. (Exhibits Q)

42.     The Plaintiff, Loretta Miller had swelling after the first open-heart surgery in 2001 from the veins that were harvested and some used. Loretta was told this was normal for edema in the later part of the day. Loretta Miller was given medications which caused her to gain weight such as the treatment of Fibromyalgia which Zoloft is used as an off labeled treatment. The Fibromyalgia turned out to be Multiple Sclerosis. Swollen feet and ankles are common in MS, and are caused by an accumulation of lymphatic fluid (lymphedema). They are considered to be a secondary symptom of the disease, because they most often develop due to a lack of mobility instead of arising as a direct result of demyelination.

14

43.     On September 18, 2007 in the hallway of Pennsylvania Hospital, Dr Howard L Haber M.D. told Loretta Miller and Marcus F Miller her son that she had: 1. Congestive Heart Failure, 2. She was going to die, 3. If Marcus F Miller did not sign the consent forms he was going to kill his mother like he killed his father who had congestive heart failure and died, 4. If Loretta did not sign the consent forms he was going to have her institutionalized like she was in Florida for wanting to commit suicide and she will never return back to Florida. It is quite clear to see the motivation Dr Howard L Haber M.D. had. He threatened, lied, and forced Loretta Miller with blackmail, hostage taking, undergoing a surgery without a second opinion all for the Medicare insurance money. The Good Insurance which will pay anything as long as they are not turned in for fraudulent claims, 5. The X-rays before the open-heart surgery showed no congestion in the lungs. If Loretta Miller had congestive heart failure the number one treatment before anything is to remove the congestion from the lungs then do a Cardiac Catheterization, then any surgery that was needed would be a heart transplant as Loretta Miller's husband was placed on the list in Florida. Not apply new veins. A new heart would come without clots, and 6. If Loretta Miller had mental issues or lack of oxygen to the brain , then all documents signed by her would be null and void.  If she signed them under duress, then all documents signed by her would be illegal and null and void. If all documents signatures were forged or not completed all the "i's" dotted and the "t's" crossed, then all documents are null and void. Loretta Miller says those are not her signatures and who every did sign them did a good job in trying to forge her signature.

44.     The Plaintiff alleges that the defendants care and treatment was in direct violation of defendant U of PH bylaws and as well as the Medicare/Medicare 42 U.S. Code § 1320a-7j (b), Medicare False Claim Act, 18 U.S. Code § 1203 (a).

## SECOND CAUSE OF ACTION

Corporate Negligence;_Thompson v. Nason Hospital 527 Pa. 330, 591 A.2d 703 (1991)._

45.     Moreover, imposing the duty of care upon a hospital should have the "prophylactic" effect of supplying the hospital with a greater incentive to assure the competence of its medical staff and the quality of medical care rendered within its walls. Otherwise stated, "[s]ince the corporate negligence theory focuses upon the hospital's own conduct in providing medical care, the spectre of liability based upon this theory should encourage the hospital to examine its conduct more carefully in order to prevent the occurrence of unreasonable harm to patients." (Comm., The Hospital's Responsibility for its Medical Staff:  Prospects for Corporate Negligence in California, supra, 8 Pac.L.J. 141, 149;  but see, Piercing The Doctrine of Corporate Hospital Liability, supra, 17 San Diego L.Rev. 383, 398–399;  see generally, Southwick, The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician, supra, 9 Cal. Western L.Rev. 429, 466, regarding the mutual dependency of a hospital governing board and its medical staff.) Indeed, the hospital is in the best position to evaluate the competence of physicians it, in its discretion, allows to perform surgery and to practice within its premises, as it

constitutes the only institutional "vehicle available to coordinate the delivery of health care of reasonable quality to large numbers of people, especially in urban areas." (Id., at p. 466;  see Vogel and Delgado, To Tell The Truth: Physicians' Duty To Disclose Medical Mistakes (1980) 28 U.C.L.A. L.Rev. 52, 74.)

46.    Plaintiff alleges ad incorporate herein by reference each and every allegations contained in the First Cause of Action as though fully set forth herein,

47.    Defendant's U of PH knew or should have known, that the exhibitions and conduct attributable to Dr Charles R Bridges Jr M.D. and Dr Howard L Haber M.D, as more fully set forth in Paragraphs 1 through 13, above, represented a route practice of Dr Charles R Bridges Jr M.D. and Dr Howard L Haber M.D.. Specifically upon miss-evaluation, miss-information, dishonesty, threatening, holding the plaintiff hostage with threats of arresting the plaintiff's son, and placing her into isolation, which was and still is mental abuse just because Dr Howard L Haber M.D. wanted extra veins and by doing so forced the plaintiff, Loretta Miller, into a dangerous situation with Dr Charles R Bridges Jr M.D. in the course of  Cardiothoractic surgery including leaving and abandoning the operation room while the patient, plaintiff Loretta Miller, was under the effect of general anesthesia, relegating chest closure, skin suturing, and stabilization of the plaintiff, Loretta Miller, by an unknown associate not listed in the Operating Report as the closure,but states *"Please note that I was present for all critical portions of this procedure. During those times,when I was not in the operating room, I was available to return immediately had been required."* According to the Operating Report, no Surgeon and no medical doctor was mentioned who supervised the nurse practitioners or physician assistants concluding Dr Charles R Bridges Jr M.D.'s procedures in his absence. Even if Dr Charles R Bridges Jr M.D. had a medical doctor in with him at the time he was there and preforming Cardiothoracic surgery, the doctor who assisted as a closing medical doctor's name was not mentioned, not recorded, and not written on what procedure he/she preformed on the a Operating Report that they is required to be inserted as part of the patients record. (Exhibit J)

48.    Upon information and belief, defendant, U of PH, and its employees and personnel, together with the hospital medical staff, were aware that Dr Howard L Haber M.D. and Dr Charles R Bridges Jr M.D. orchestrated an un-needed, unnecessary, surgery; lied to Medicare, a Department of the United States department, to commit Medicare fraud for a surgery that would have been an elective surgery that Medicare would not have paid defendants Dr Howard L. Haber M.D., Dr Charles R Bridges Jr M.D., and Ralph Muller CEO and Trustees Pennsylvania Hospital aka University of Pennsylvania their revenue. The plaintiff asked to speak to a hospital Ombudsman to intervene before the surgery and after the surgery. The plaintiff was denied by the Supervising Nurse on both requests because the Supervisor Nurse said both doctors were esteemed practitioners and that the plaintiff could just leave but when the Supervisor Nurse Jane Doe was asked to untie the plaintiff the Supervisor Nurse said she can not do that, defendants Dr Howard L Haber M.D. and Dr Charles R Bridges Jr M.D.'s verbal orders were to not let the plaintiff leave or use the phone. That the plaintiff was under house arrest by them, held hostage, isolated from the

world, and was being surgically altered for the convenience of defendant Dr Howard L Haber M.D. for extra veins using the same diagnosis of 2001 when no physical changes were needed. Defendant Dr Charles R Bridges Jr M.D. went along with the scam for the money from great payout from Medicare knowing 98% of the payouts are not investigated unless Medicare is informed. The plaintiff had no proof until 2016 when x-rays were taken and the cardiologist at Watson asked for her hospital records from the plaintiff's surgery. Personal gains and corporation gains from the hostage torture surgery of plaintiff Loretta Miller was the choice of the defendant's. Whether plaintiff Loretta Miller lived or died, the defendant's Ralph Muller and Trustees Pennsylvania Hospital aka University of Pennsylvania, Dr Howard L Haber M.D., and Dr Charles R Bridges Jr M.D. will still get paid by medicare unless Loretta Miller called the police or any authority. This was why Loretta Miller was kept sedated.

49.    U of PH bares liability to plaintiff Loretta Miller under the Doctrine of Corporate Negligence. In 1991, corporate negligence was recognized as a cause of action by the Pennsylvania Supreme Court in the case of *Thompson v. Nason Hospital 527 Pa. 330, 591 A.2d 703 (1991)*. Corporate negligence is a doctrine under which a hospital is liable if it fails to uphold the proper standard of care owed a patient. This "standard of care" ensures a patient's safety and well-being while hospitalized. Defendant U of PH liability is/was to create a non-delegable duty with which the U of PH owes directly to a patient. In other words, an injured party does not have to establish the negligence of a health care professional in the employ of the hospital in order to bring forth a claim of corporate negligence. Vicarious liability is the cause of action for a claim wherein the injured party alleges negligence on the part of the hospital's employee or agent, such as a physician, nurse, therapist, etc. The hospital's non-delegable duties, in the context of a corporate negligence claim, are classified into four general areas: a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; a duty to select and retain only competent physicians; a duty to oversee all persons who practice medicine in the hospital; and a duty to formulate, adopt, and enforce adequate and appropriate rules, policies, and procedures to ensure quality care for the patients. In Thompson, the Pennsylvania Supreme Court reasoned that a corporate negligence claim was needed for hospitals "in full recognition of the corporate hospital's role in the total health care of its patients." Both vicarious liability and corporate negligence claims may be brought against a hospital in a medical malpractice lawsuit. In addition, specific claims may be brought against individual health care professionals who cared for the patient while in the hospital.

50.    The Negligent conduct of Dr Howard L Haber M.D. and Dr Charles R Bridges Jr M.D. was ignored by Supervisor Nurse Jane Doe, where Dr Howard L Haber M.D. remains a member of the hospital staff as well as a professor, in good standing, availing himself of hospital's facilities. Dr Charles R Bridges Jr M.D. has left U of PH and is living at 106 Pine Street, Auburndale, MA 02466 working for Johnson and Johnson as the Vice President, Medical Devices, Cardiovascular Therapeutic Area Expert and a Professor of Cardiovascular Surgery at Icahn School of Medicine at Mount Sinai Hospital. However both doctors have had a complaint filed with the Pennsylvania Medical Board. Dr Charles R. Bridges Jr M.D. has been avoiding the

investigator for the Pennsylvania Medical Board. U of PH has hidden the whereabouts of Dr Charles R Bridges Jr M.D. to allegedly protect him. Also Dr Charles R Bridges Jr M. D. works in the State of New York and does not have a Medical License. (Exhibit R)

51.     U of PH owed Loretta Miller a duty to ensure the competency of it medical staff and evaluate the quality of medical treatment rendered on it's premises. The Hospital should not have allowed Dr Charles R Bridges Jr M.D. to go to his laboratory, abandoning the plaintiff on the surgery table, with the plaintiff's tissues for DNA and micro-RNA which he was in and still in research with Human Heart Tissues involved with congestive heart failure. In order for Dr Charles R. Bridges Jr M.D. to be paid by Medicare for his time in his laboratory; that the defendant's Dr Charles R. Bridges Jr M.D. and Dr Howard L Haber M.D. to be paid by Medicare; had to invent that the plaintiff was being treated for congestive heart failure because all her graphs were blocked which they were not and prescribe congestive heart failure prescription such as Diovan six (6) months after the surgery and Lasix right after the surgery but did not prescribe an anti-clotting medication right after the surgery such as Plavix; hoping the plaintiff would not question the defendant since the plaintiff trusted defendant Dr Howard L Haber M.D. and the plaintiff would keep coming in as a patient to see defendant Dr Howard L Haber M.D.. Both defendant's secret would never be revealed as well as the continuation of congestive heart failure treatment, telling the plaintiff that the plaintiff had diabetes when the plaintiff has Hashimoto. This secret would go to the plaintiff's grave, but it did not. The plaintiff went to another doctor in Florida and the secret of the plaintiff's false congestive heart failure diagnosis was revealed that she didn't have congestive heart failure.

52.     U of PH owed Loretta Miller a duty to ensure the competency as well as the honesty of its medical staff and to evaluate truthfully the quality of medical treatment rendered on its premises. Ralph Muller CEO and Trustees Pennsylvania Hospital aka University of Pennsylvania were on actual and constructive notice of both defendant's Dr Howard L Haber M.D. and Dr Charles R. Bridges Jr M.D.'s routine of intrasurgical abandonment of the plaintiff, patient Loretta Miller, unavailability during postoperative stabilization efforts where Loretta Miller suffered *ventilation failure* which was *drug related* and the drug is not mention that caused an survive allergic reaction. This drug related issue caused circulatory, neurologic and respiratory failures and according to the attending physician Dr Scott Falk M.D. Statement on this CCU report that this issue *"requires high complexity decision making for assessment and support including frequent ventilator adjustments, neurological monitoring and treatment, frequent evaluation and titration of therapies and extensive interpretation of multiple databases, Critical care, Time devoted to patient care service described in this note = 28 minutes face to face / 42 minutes total evaluation time"*. The defendant Dr Howard L Haber M.D. as well as Dr Charles R Bridges Jr M.D. were no where to be found. For Dr Howard L Haber M.D. was a now religious Jew and because it was Yom Kippur was at services. Dr Howard L Haber M.D. refused to allow the Plaintiff, who is Jewish, to observe her holiday or even send in a Rabbi to pray for her life. Dr

Howard L Haber M.D. denied the plaintiff her religious rights by using his limited knowledge since Dr Howard L Haber M.D. is not a Rabbi to explain Yom Kippur and forced Loretta Miller under her denial and her First Amendments rights to a life of happiness, freedom of religion and her freedom of speech by denying her the right to speak to a Rabbi, an Ombudsman, or to the Hospital Administrator fearing she would expose her concerns of her being held against her will, forcing her to have a surgery against her will, and which promoted mental anguish to the point it took her a long time to trust any cardiologist or even a primary physician. The defendant's orders were to not allow the plaintiff's son Marcus F. Miller to stay with her during the time of recovery in CCU since the plaintiff was having ventilation failure; the plaintiff was still tied down to the bed having seizures; her throat was filling up with fluids from lack of lung and circulatory control; did not inform the plaintiff's son his mother was in danger of dying but literally told him he had to leave, isolating Marcus F. Miller from his mother who was dying from a drug related problem that U of PH caused by forcing an open-heart surgery on plaintiff Loretta Miller that she did not need because of the "good insurance of Medicare and not to worry about payment" the defendants Dr Howard L Haber M.D. and Dr Charles R Bridges Jr M.D. reassured her and themselves since they were guaranteed to be paid as well as the hospital. (Exhibit S)

53.    Whereas Plaintiff has alleged a deprivation of a Federal right, The Fourteenth Amendment to the United States Constitution provides in pertinent part, that no state shall " deprive any person of life, liberty or property without due process of law... " United States Constitution Amendment XIV § 1. This Clause is the source of three different kinds of constitutional protection " Daniel v William, 106 S. Ct. 677. 677 (1986) (Stevens, J., concurring). "First, it incorporates specific protections defined in the Bill of Rights" *Id* "Second, it contains a substantive......." ( internal quotations and citation omitted), And "[t]hird, it is a guarantee of fair procedure sometimes referred to as ' procedural due process'...." *Id*. The plaintiff claim, explained above arising under the substantive component of due process.

54.    U of PH allowed their staff, their employees, and their Physicians to deny Loretta Miller her rights under the First Amendment freedom of speech and religion. She was not allowed to call the authorities to have them free her of this enslavement. They tied her to the bed so she could not leave knowing that this elective surgery they called an "emergency" could kill her, maim her for life, and possibly leave her in a vegetated stage. Howard L. Haber MD decided he knew what was best for Loretta Miller when it came to her Judaism. Knowingly it was Yom Kippur... the day of Judgment... where the Book of Life is opened and your name is written in there. That action determines whether you live or die or your health and it was important to her to spend it with the little family she had who supported her when Jordan, her husband, passed away. Dr Howard L Haber M.D. did not allow her to say Kaddish, a special prayer for the dead. Also twelve (12) days after Yom Kippur was the Anniversary of Jordan's death on the Jewish Calendar, Loretta Miller never missed a visit to Jordan's grave on this anniversary. Dr Howard L Haber M.D. forced her to miss this anniversary when he held her hostage in the Pennsylvania Hospital aka as University of Pennsylvania. Dr Howard L Haber M.D. the agent for U of PH denied her the basic "Natural" rights the First Amendment guarantee's freedom of religion and he denied

her right to practice as a Jew to pray at a Synagogue on Yom Kippur the most Holy Day of the Jewish Calendar year.

55.     The Fourteenth Amendment, the agents of the U of PH were Dr Howard L Haber M.D. and Dr Charles R. Bridges Jr M.D. over stepped their expertise by stating to plaintiff Loretta Miller had a lack of Oxygen going to her brain and by doing so they were hoping plaintiff Loretta Miller would react in a violent manner and they would have due cause to restrain her. The law in every mental illness custodial case is to have three (3) State appointed psychiatrist interview Loretta Miller, perform a State Mini Mental examination to determine if Loretta Miller was incapacitated and a court hearing on such. Even if Loretta Miller was incapacitated she had appointed her son Marcus F. Miller as Health Care Directive as a Medical Power of Attorney that states he has the right to remove her from a medical facility if he saw it fit to do so. But the defendant agents of the U of PH, Dr Howard L Haber M.D. and Dr Charles R. Bridges Jr M.D. laughed, ignored and threatened Marcus F. Miller that they were going to have him arrested, that he was killing his mother the way he killed his father, that he was abusing his mother, and that he was not in his right mind and incapacitated. The word incapacitated flowed through the agents of U of PH's mouths many times and Loretta Miller questioned him. If the plaintiff was incapacitated then why were they demanding the plaintiff to sign. They had no words for the answer other then tie the plaintiff to the rolling bed.

56.     The Agents of the U of PH violated the Thirteenth Amendment which pertains to slavery. "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Through the restraining of Loretta Miller to a bed and forcing/holding her hostage and punishing her for not wanting a surgery which could harm her, kill her, or could cause her in the end to live in a vegetated person violated her rights under the Thirteenth Amendment. The act against slavery covers all races, all creeds all nationalities, all religions. 18 U.S. Code § 1203

57.     U of PH allowed their staff, their employee, and their Physicians to cut, sever, snip, clip, and hid the Temporary Epicardial Wires by allowing them to retract into the body which should have been removed three (3) to five (5) days after the surgery and not tell the plaintiff of such wires were, remained, or attached to her heart and body. No card was provided for such a procedure nor was it written in her hospital records that these wires remained. U of PH agent Bryan Blanchard, CRNP was untruthful on his Discharged Summary and stated the "epicardial pacing wires were discontinued without any sequelae" when he cut , severed, snipped, clipped, and hid the fact that the Temporary Epicardial Wires were permitted to retract, curl up, and remain in the Chest of the Plaintiff without telling her they were there or giving her a card stating they were there. Loretta Miller can not pass through a visual metal detector in any airport with these wires without being cavity search and questioned especially if she wanted to travel internationally without these four (4) wires showing.

58.     U of PH hospital records do not indicate, show any brand, model number, or serial number of the Temporary Epicardial Wires. These wires could have been

recalled for various reasons according to the FDA. The hospital is responsible for the written portion of the records and any record that has their stamp or is found in the patient's hospitalization history

59.    The Temporary Epicardial Pacing Wires have been making their way to the skin below the rib cage but are unable to be pulled out. The piercing of the skin by the wires under the rib cage has caught unto clothes but they cannot be removed or pulled out unless surgery is done which would be too dangerous for the plaintiff to under go after the 2nd open heart surgery.

60.    U of PH  negligently failed to screen the competency of staff members Dr Charles R. Bridges Jr M.D. thereby subjecting patients to negligent, inadequate medical care that was rendered to the plaintiff at defendant U of PH. Dr Charles R Bridges Jr M.D. saw Loretta Miller for the first time after six (6) years in the hallway of U of PH with a consent form in his hand and with Dr Howard L. Haber M.D. at his side. This claim is brought under doctrines recognizing ;*Thompson v. Nason Hospital 527 Pa. 330, 591 A.2d 703 (1991):Elam v College Park Hospital  CIV 24470 ,  Perez v. Schur, No. 354963, filed June 17, 1974;  Earlywine v. Schur, No. 359278, filed October 22, 1974;  and Bailey v. Schur, No. 383533, filed June 17, 1976. Each case involved Schur's first seeing the patient less than a week before the operation.*

### THIRD CAUSE OF ACTION
### (SENIOR ADULT ABUSE)

61.    Plaintiff alleges and incorporates herein by reference each and every allegation contained in the First and Second Cause of Action as though fully set forth herein.

62.    According to Pennsylvania laws and the United States Laws, Loretta Miller's magic age for classified as a senior citizen is fifty-five (55) years of age, Plaintiff was fifty-seven (57) years old at the time of the conduct alleged.

63.    Plaintiff appointed Marcus F Miller, her son, to be her Health Care Directive (Living Will/Health Care Power of Attorney and that has not change). Loretta Miller's Will she has left everything she owned to Marcus F Miller, her son. (Exhibit E)

64.    Marcus F Miller, as Health Care Directive, had the right to take charge and be at the Plaintiff's side 24/7 to make medical decisions for her while she was incapacitated from the cause of Ventilatory Failure and was in a coma. He had the right to know the exact condition of the Plaintiff. Defendants, agents of U of PH, said the surgery was successful but forgot to tell him his mother was in Ventilation Failure. Marcus F. Miller was told to leave and not come back until the next day. Agents of the U of PH were not truthful and refused to acknowledge the Health Care Directive Document. Because of the name Health Care Directive the U of PH was unfamiliar with it. *An advance healthcare directive, also known as living will, personal directive, advance directive, medical directive or advance decision, is a legal document in which a person specifies what actions should be taken for their health if they are no longer*

*able to make decisions for themselves because of illness or incapacity. In the U.S. it has a legal status in itself.* Humiliation and ridicule Emotional abuse by intimidation.

65.     Dr Howard L Haber M.D. told Marcus F Miller, in front of the Plaintiff, in the form of a question "You don't want your mother to die like you father did, now do you?" accusing Marcus F Miller of killing his father when he didn't. Even though it was the Plaintiff's, Loretta Miller, decision not to have the surgery and told Marcus F Miller not to sign. Emotional abuse.- intimidation through yelling and threats – Humiliation and ridicule.

66.     The Defendants threatened Marcus F Miller of an arrest in front of the Plaintiff so she would be in fear of them and submit to their demands. Emotional abuse - intimidation through yelling and threats – Humiliation and ridicule.

67.     The Defendants threatened the plaintiff if she did not sign the consent forms both defendants would classify her as having mental issues and was committing suicide. At that point she would be committed to the University of Pennsylvania Mercer Hall Mental Health Institute and then get an emergency court order the next day to force Loretta Miller to have this emergency surgery which was an elective surgery that she did not need. Exploiting a senior citizen, Emotional abuse - intimidation through yelling and threats – Humiliation and ridicule, Neglect, and Psychological abuse.

68.     Defendant's tied Loretta Miller down with restrains until she signed the consent forms threatening her if she untied herself or had the help of someone untie her such as Marcus F. Miller, her son and Health Care Directive, who had the right to untie and care for the plaintiff, the defendant's would have Marcus F Miller arrested. Emotional abuse - intimidation through yelling and threats – Humiliation and ridicule, Neglect, Psychological abuse.

69.     Defendant's kidnapped and isolated, claiming that Loretta Miller was not responsible for her actions, that she did not have enough oxygen going to her brain and that she will not remember this day because of a lack of oxygen. The plaintiff remembers everything and if she was incapacitated as they claimed, Marcus F Miller, her son, was her Power of Attorney and Health Care Directive which they totally ignored. Emotional abuse - intimidation through yelling and threats – Humiliation and ridicule, Neglect, Psychological  abuse.

70.     Defendants alleged they undertook and agreed this was a necessary surgery but never showed the proof that this was necessary for the plaintiff to undergo a elective surgery they called an "emergency". The defendants did not allow the plaintiff a second opinion for this medical care and the defendants had no regard for the plaintiff's physical well-being. Defendants, and each of them, subjected plaintiff Loretta Miller to neglect and abandonment during the completion of the open-heart surgery and postoperative recovery, stabilization as well as leaving the Temporary Epicardial Pacing Wires in the chest of the Plaintiff and not telling the plaintiff or putting this information in the Operative Summary or Discharge Summary. Neglect.

22

71.    The Plaintiff is classified as a disabled senior with Multiple Sclerosis. The defendants knew the plaintiff had Multiple Sclerosis and was disabled. They took advantage of the fact the plaintiff was a widow who was still grieving for her husband and the defendants used this grief along with threats to force the plaintiff to sign a consent form under duress. The defendant's negligence and abandonment of the Disabled widow. Psychological abuse, Emotional abuse

72.    Plaintiff is informed and believes, and on that basis alleges, that the actions and the conduct of defendants, the defendant's employees, and the defendant's agents were intentional, malicious, oppressive, threatening, and fraudulent, justifying the imposition of punitive damages, which may be the subject of a **231 Pa. Code Rule 4003.7.  or 15 U.S. Code § 6604**

### Statute of Limitations

73.    Statute of Limitation only applies for two (2) years unless a object is found. From the time of the findings the Statute of Limitation begins. May 2016 the Temporary Epicardial Pacing wires were found and medically noted. Under the strict **medical malpractice statute of limitations**, you would be unable to file your claim at this point. However, under the discovery rule, if you did not know of the existence of this **injury** until three years later, then the **statute** does not begin to run until you discover the **injury**.

74.    Plaintiff alleges and incorporates herein by reference each and every allegation contained in the First, Second, Third Causes of Action and Statute of Limitations as though fully set forth herein.

75.    Wherefore the plaintiff Loretta Miller requests this lawsuit to be reviewed , judged and determined in US Federal Courts due to the Political Contributions given to the Pennsylvania Court Judges as well as the lower courts in Philadelphia Pennsylvania; the Medicare Fraud; the terrorist hostage holding in the hospital by "esteemed" Doctors of the University of Pennsylvania. Pennsylvania has a law that the only medical witness must come from Pennsylvania doctors where Pennsylvania cardiologist are fearful to testify against them and the cardiologist in Florida are willing to.

76.    We are asking the venue to be in Central Florida due to the fact Loretta Miller is disable and Pennsylvania does not allow Skype conferences court cases.

**Wherefore** the plaintiff Loretta Miller prays for her judgment against Defendants, and each of them

separately an together as hereafter set forth:

1.    For  general damages in a just and reasonable amount in excess of the jurisdictional minimum of this Honorable Court.

2.    For special damages according to proof of the Temporary Epicardial Wires and Untruths.

3.    For the actions and the conduct of defendants, defendants' employees, and defendants' agents were intentional, malicious, oppressive, threatening, and fraudulent, justifying the imposition of punitive damages, which may be the subject of a 231 Pa. **Code Rule 4003.7.  and/or 15 U.S. Code § 6604**

4.    For such other relief as the this Honorable Court Deems just and proper.


By _____  Date 3/12/18
Loretta Miller Pro Se